UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMIE VAN KLAVEREN

                Petitioner,                Case Number 2:11-CV-12232
                                                                  Honorable Denise Page Hood

v.

PAUL KLEE,

                Respondent.
_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS**

This matter is before the Court on Petitioner Jamie Van Klaveren's petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in the Kent Circuit Court of sixteen counts of criminal sexual conduct involving eight different minor victims. As a result, he was sentenced to a string of consecutive terms requiring him to serve a total of 75-to-150 years in prison. The petition raises three claims: (1) the trial court erred in consolidating Petitioner's cases for trial; (2) Petitioner was denied the effective assistance of counsel; and (3) the prosecutor committed misconduct during closing arguments. The Court finds that Petitioner's claims are without merit. Therefore, the petition will be denied. The Court will also deny Petitioner a certificate of appealability and deny permission to proceed on appeal informa pauperis.

### I. Facts and Procedural History

The charges against Petitioner involved allegations of sexual abuse made against him by eight boys. The allegations came to light when one boy, TC, told his sister and mother what had happened. The subsequent police investigated resulted in the discovery

of the other complainants. All the charges against Petitioner were tried together.

TC testified at Petitioner's trial that in the summer of 2006, he was friends with Petitioner's thirteen-year-old step-son, MB. One night that summer, TC slept over at Petitioner's house. The three slept together in Petitioner's bed. While they were in bed watching television, Petitioner began to massage TC's "private" under his clothes. The same thing happened the next night when TC slept over again.

Rachel Kulesa, TC's mother, testified that when she suggested that TC spend another night at Petitioner's house, her nine-year-old daughter told her that TC did not want to go to his house. Kulesa talked to TC, and based upon what TC told her, she confronted Petitioner. Kulesa later called the police.

Sergeant Troy Woodwyk of the Kent County Sheriff's Department was dispatched to TC's home. Based on his conversation with TC and Kulesa, he went to Petitioner's home and talked with him. Petitioner admitted to being in bed with TC and massaging his neck. Later, Petitioner was interviewed by Detective William Hefron. Petitioner again admitted to sleeping in the same bed with MB and TC. He also told the officer that he had at least fifty children spend the night over the years.

MB, Petitioner's step-son, testified that when he nine years old he met Petitioner when he spent the night with friends who were staying at Petitioner's house. During his second visit to Petitioner's house, Petitioner fondled his penis. The conduct continued over a period of time. Eventually, Petitioner and MB's mother were married. After Petitioner became his stepfather, they slept in the same bed. Petitioner began to perform oral sex on MB, and MB did the same to Petitioner. Petitioner's abuse of MB continued to the point where Petitioner began having anal sex with MB. MB did not tell his mother because

Petitioner threatened him and bribed him.

MB testified to an incident where he invited a friend, LK, over. MB and LK slept in the same bed with Petitioner, and MB observed Petitioner fondle LK's penis.

MB testified that he was friends with another boy named BG, who lived in the same trailer park. MB befriended BG after Petitioner spotted BG one day while they were driving. Eventually, BG spent the night and Petitioner fondled his penis and performed oral sex on him. MB testified that several different young boys would stay at his house and Petitioner would use the same routine to sexually assault them.

Jessica Van Klaveren testified that she met Petitioner through her son, MB. They eventually married, and Jessica moved into Petitioner's trailer with MB. She testified that there were always kids sleeping over. When this occurred, Petitioner would sleep in the same bed with MB and the other kids while she slept on the sofa. She explained that Petitioner did so to keep the kids quiet. Jessica did not think it was odd that Petitioner often slept in bed with MB while she slept on the couch because Petitioner and MB were close, and the couch was good for Jessica's bad back.

Jessica testified that once she walked into the bedroom and thought she saw MB performing oral sex on Petitioner. The two tried to convince her that Petitioner was merely showing MB his pubic hair. Jessica did not know what to believe and checked herself in to a psychiatric hospital. She explained that she suffered from bipolar disorder and schizophrenia.

On March 14, 2007, while the case involving TC was pending, there was an argument between Petitioner and MB. MB told Jessica that Petitioner had molested him and other boys, and he retrieved pornographic videos that he claimed Petitioner made him

watch. Jessica called the police and some of the mothers of the boys that MB named.

DB testified that he is Petitioner's cousin. He met Petitioner when he was six years old. At some point, DB met MB and the three of them began to hang around together. DB testified that sometimes he and MB would be playing video games and Petitioner would walk in "and try to do stuff with us." DB testified that Petitioner would put his mouth on his penis. DB also saw Petitioner put his mouth on MB's penis. They also played a game with Petitioner called "Truth or Dare" in which Petitioner would dare them to touch each other and engage in oral sex with each other.

DB's sister testified that she saw Petitioner reach under the covers and touch DB's penis and begin to masturbate him while they were sleeping in the bed together. She woke DB and told him not to go to sleep again. DB's sister told her mother what she saw, but her mother thought that she was lying.

MV testified that he was MB's best friend, and he would visit him at Petitioner's house. MV testified that Petitioner assaulted him by engaging in oral and anal sex with him. When MV heard that MB told his mother about the abuse, MV also told his mother.

Thirteen-year old LK testified that he was friends with MB. One night while LK was spending the night at Petitioner's house, the three of them played truth or dare. Petitioner dared LK to give him oral sex, which LK did. He also testified that sometimes he would go to sleep at night and wake up with Petitioner touching his penis.

Sixteen-year-old BG testified that he met Petitioner when Petitioner and MB pulled up next to him in the trailer park and started talking to him. Shortly thereafter he spent the night at Petitioner's house with MB. BG spent the night at MB's house almost every weekend. During these times, Petitioner would give BG pills and/or alcohol to make him

"loopy." He also gave BG silk shorts to wear before he would begin touching his penis. He also performed oral sex on BG.

Thirteen-year-old GW testified that he met MB in the trailer park and began to visit him at Petitioner's trailer where Petitioner would engage in oral sex with him. He testified to a birthday party hosted by Petitioner at a hotel where Petitioner made all the boys get naked. Petitioner then had oral sex with GW and MB and another minor named JS.

Thirteen-year-old JS was MB's cousin. He testified that he would often visit Petitioner. One night when he was seven or eight years old, he woke up in the middle of the night to find Petitioner touching his penis. This happened several times. Petitioner also engaged in oral sex with JS and made him masturbate Petitioner with his hand. JS also saw MB engage in oral sex with Petitioner. JS testified that Petitioner would supply them with pot, pills and alcohol that would make them feel dizzy and weird before engaging in sexual acts with them. JS did not tell anyone about the abuse because Petitioner threatened to kill his mom.

Several of the complainants' mothers testified and confirmed that their sons slept over at Petitioner's house during the relevant time period.

Thomas Cotrell testified as an expert on child sexual abuse. He explained the phenomenon of delayed disclosure of sexual abuse by children.

When interviewed and confronted with MB's allegation as well as others, Petitioner provided several different scenarios including that he was medicated, he was a heavy sleeper and may not have known what he is doing. Petitioner also claimed to have a split personality named Alex who may have been responsible for the assaults. Although Petitioner never outright confessed to the sexual assaults, he said that they could have

happened, he had "hazy recollections of something happening," and he was sorry if anything did happen.

Following arguments and instructions, the jury found Petitioner guilty of seven counts of first-degree criminal sexual conduct, four counts of second-degree criminal sexual conduct, four counts of third-degree criminal sexual conduct, and one count of fourth-degree criminal sexual conduct.

.    Following sentencing, Petitioner appealed his conviction to the Michigan Court of Appeals. His appellate brief raised the same three claims presented in this action. The Court of Appeals issued an unpublished opinion affirming Petitioner's convictions. *People v. VanKlaveren*, No. 286683 (Mich. Ct. App. February 2, 2010).

Petitioner filed an application for leave to appeal this decision in the Michigan Supreme Court, but the application was denied by standard order. *People v. VanKlaveren*. No. 14047 (Mich. Sup. Ct. June 28, 2010).

Petitioner then commenced the instant action by filing his application for a writ of habeas corpus, raising the same three claims he presented to the state appellate courts.

## II. Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or

theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id*. Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*., at 786-787.

## II. Analysis

### A. Joinder of Trials

Petitioner's first claim asserts that the trial court erred in granting the prosecutor's motion to try the eight cases against him together.

"Improper joinder does not, by itself, violate the constitution. Rather, misjoinder

would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his . . . right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446, n.8 (1986). The issue "is not whether the failure to sever counts for separate trials was a violation of a state rule of procedure, but whether the failure to sever denied the petitioner due process of law under the Fourteenth Amendment." *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007). To establish prejudice from joinder, a defendant must point to specific evidence that the joinder was prejudicial. *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005). "[A]n unproven assertion is not compelling evidence of actual prejudice." *Id.* at 679. "[A] jury is presumed capable of considering each criminal count separately, and any prejudice may be cured by limiting instructions." *United States v. Cope*, 312 F.3d 757, 781 (6th Cir. 2002) (internal citations omitted).

It was not fundamentally unfair to join the eight criminal cases against Petitioner in a single trial. As the Michigan Court of Appeals noted, if the cases were tried separately, the evidence concerning each victim would have been admissible at each trial under Michigan law:

> Regardless of whether the trial court granted the motion for consolidation, the prosecution would have been permitted to introduce evidence relating to each of the alleged acts of CSC that defendant has committed. Pursuant to MICH. COMP. LAWS 768.27a, "in a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant." Under this provision, the prosecution would have been permitted to introduce evidence of all of the alleged acts of CSC that defendant committed against minors. Similarly, some of the evidence in question was potentially admissible under MICH R. EVID. 404(b)(1), which provides that other-acts evidence may be admissible as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident. Therefore, the trial court's decision to consolidate these cases did not have any evidentiary

impact. As a result, defendant is not entitled to relief because he cannot establish that the consolidation constituted a plain error that affected his substantial rights.

*People v. VanKlaveren*, supra at 2.

The mutually corroborating testimony by the complainants, which Petitioner claims was an unfair result of the joinder, would have occurred at separate trials as well. Petitioner was not prejudiced by having a single jury hear all the sex charges against him, as the full breadth of the charges would have been heard by each jury even if the cases had been tried separately. *See United States v. Jacobs*, 244 F.3d 503, 507 (6th Cir. 2001); *Krist v. Foltz*, 804 F.2d 944, 947-48 (6th Cir. 1986). Nor can this Court question the state appellate court's determination that the evidence of each sexual assault would have been admissible in separate trials. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (holding that errors in admission of evidence under state law are usually not cognizable in a § 2254 proceeding). Petitioner's first claim is therefore without merit.

### B. Ineffective Assistance of Counsel

Next, Petitioner argues that he was denied the effective assistance of counsel when his attorney failed to object to the joinder of charges. In fact, Petitioner's trial counsel stated that he agreed with the decision to try the cases together. Tr. 6/4/2007, at 5.

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's

performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction [or sentence] resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Petitioner has satisfied neither prong of the *Strickland* test. With respect to deficient performance, trial counsel may have believed joinder of the charges could benefit Petitioner because the prosecutor would have only one chance for conviction instead of multiple chances. The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel was ineffective. *See, e.g., Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) ("an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken"). Petitioner has failed to demonstrate that trial counsel was deficient in this regard.

Petitioner has also failed to establish that he was prejudiced by trial counsel's decision to allow charges to be tried together. As the Michigan Court of Appeals found,

joinder of the charges was proper. Thus, there is no reason to believe that the charges would have been tried separately even if defense counsel had objected. Moreover, because the evidence of each charge would have been admissible at each trial, there is no reasonable probability that the outcome of separate trials would have been more favorable to Petitioner. Consequently, Petitioner cannot show that he was prejudiced by counsel's decision not to oppose the joinder of the charges. See *Woodruff v. Lafler*, No. 05-CV-74623-DT, 2007 U.S. Dist. LEXIS 10059, 2007 WL 522704, *5-6 (E.D. Mich. Feb. 14, 2007) (habeas petitioner failed to show prejudice from counsel's failure to seek severance where the acts would have been cross-admissible).

### C. Prosecutorial Misconduct

Petitioner's final claim asserts that the prosecutor committed misconduct during closing arguments, rendering his trial fundamentally unfair. Specifically, Petitioner asserts that the prosecutor improperly referred to the evidence of his guilt being "un-refuted."

The United States Supreme Court has made clear that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly*); *Parker v. Matthews*, U.S. , 132 S. Ct. 2148, 2153, 183 L. Ed. 2d 32 (2012) (confirming that *Donnelly/Darden* is the proper standard).

Petitioner complains about two statements made by the prosecutor. During its

closing argument the prosecutor stated:

> Now, with all of the forms of criminal sexual conduct, the victim's testimony alone is sufficient and that's because, as you know, these things don't happen on the city street. There are usually only two people who know what happened and you've heard from one of them, or many of them, actually, but for each count, one of them.

Tr VII, at 6.

> Then, in rebuttal argument, the prosecutor stated:
>
> And so when he says in the end of his closing argument, "What had the evidene shown," the evidence has shown unrefuted, unrefuted allegations of abuse. You have not heard any testimony that he didn't do it. None. He is guilty of first degree, he is guilty of third degree, he is guilty of second degree, and he is guilty of fourth degree, and I ask you to so find.

T VII, at 123.

In *Griffin v. California*, 380 U.S. 609 (1965), the Supreme Court held that neither the court nor the prosecutor may invite the jury to infer guilt from the defendant's decision not to testify. "It is axiomatic that a defendant in a criminal trial need not testify or produce any evidence, and that a prosecutor may not comment on the absence of such." *United States v. Bond*, 22 F.3d 662, 669 (6th Cir. 1994). However, a prosecutor ordinarily is "entitled to wide latitude in rebuttal argument and may fairly respond to arguments made by defense counsel." *Angel v. Overberg*, 682 F.2d 605, 607-08 (6th Cir. 1982) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The prosecutor may summarize the evidence and comment on its quantitative and qualitative significance. *Bond*, 22 F.3d at 669.

In *Lockett v. Ohio*, 438 U.S. 586, 594-95 (1978), the Supreme Court held that the prosecutor's repeated remarks that the State's evidence had been "unrefuted" and "uncontradicted" did not constitute an impermissible comment on the defendant's failure to testify. In that case, the defendant's counsel had "clearly focused the jury's attention on

[the defendant's] silence" by outlining the defendant's contemplated defense in his opening argument stating to the jury and the court near the end of the case that the defendant would be the next witness, even though ultimately she did not testify. *Id.* at 595. "[W]hen viewed against this background, it seems clear that the prosecutor's closing remarks added nothing to the impression that had already been created by Lockett's refusal to testify after the jury had been promised a defense by her lawyer and told that Lockett would take the stand." *Ibid.*

Here, unlike *Lockett*, defense counsel never suggested that Petitioner would testify. Contrary to what the Michigan Court of Appeals found, the second statement was clearly an improper comment regarding Petitioner's failure to present witnesses in his defense. C.f. *Lundy v. Campbell*, 888 F.2d 467, 478 (6th Cir. 1989) ( prosecutor's statements during closing argument that the "only story" concerning the crimes came from the state's witnesses was not manifestly intended to reflect upon the defendant's silence, nor was it of such character that the jury would naturally and necessarily take it as such).

Nevertheless, the improper comment was not so egregious so as to entitle Petitioner to habeas relief. First, the improper comment was isolated. In order to justify relief, alleged misconduct must be flagrant and not isolated. *See United States v. Humphrey*, 287 F. 3d 422, 433 (6th Cir. 2002). Here, the prosecutor's argument focused on the evidence it presented against Petitioner to convince the jury to render a guilty verdict. Petitioner points to only two small portions of the argument that he alleges were improper. Of these, only the second portion improperly suggested that Petitioner did not offer any defense evidence. This isolated improper argument was insufficient to render Petitioner's entire trial unfair.

Second, the prosecution's argument did not deprive petitioner of a fair trial because

any possible prejudice which might have resulted from any burden shifting comments was cured by the trial court's instructions regarding the burden of proof. *See Scott v. Elo*, 302 F. 3d 598, 603-04 (6th Cir. 2002). The trial court's instructions to the jury unambiguously stated that the prosecutor bore the burden of proof with respect to each element of the crimes and that Petitioner was not required to prove his innocence or do anything at all. Tr. VII, at 126-127. The trial court also specifically told the jury that it could not consider that fact that Petitioner did not testify. Id. Juries are presumed to follow their instructions. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001). Petitioner has offered no reason to believe that the comment at issue here was so egregious that the jury was unable to follow its instructions.

Finally, the evidence of Petitioner's guilt was overwhelming. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); see also *Fry v. Pliler*, 551 U.S. 112, 117-18 (2007); *Ruelas v. Wolfenbarger*, 580 F.3d 403 (6th Cir. 2009).The eight complainants were consistent in their testimony. Their similar descriptions of the nature and circumstances of the molestations presented a very compelling case for the prosecution. Their testimony was corroborated, in part, by Petitioner's wife. She acknowledged that Petitioner slept in a bed with her son and other boys while she stayed on the couch. She also described an incident where she may have observed her son perform oral sex on Petitioner. The other complainants' mothers confirmed that their boys slept over at Petitioner's house during the relevant time frame. Finally, while Petitioner did not explicitly confess to the crimes, his statements to police suggested that "something"

might have happened and that his split-personality may have been responsible. Given this evidence, it is clear that the jury's verdict was based on the facts of the case and not an isolated improper remark by the prosecutor. There is no reasonable probability that any prosecutorial error affected the jury's verdict.[1]

## IV. Certificate of Appealability

Before Petitioner may appeal this decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id.* at 336-37. The Court concludes that a certificate of appealability is not warranted in this case because reasonable jurists could not debate the Court's assessment of Petitioner's claims. The Court will also deny Petitioner permission to proceed on appeal in forma

---

[1] A portion of Petitioner's second claim asserts that his counsel was ineffective for failing to object to the misconduct. Because the misconduct claim does not warrant relief, Petitioner was not prejudiced by his counsel's failure to make an objection. See *Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010)

pauperis because an appeal could not be taken in good faith.

## V. Conclusion

For the foregoing reasons, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the matter is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that permission to proceed on appeal in forma pauperis is **DENIED**.

                                                    S/Denise Page Hood
                                                    Denise Page Hood
                                                    United States District Judge

Dated: January 31, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 31, 2013, by electronic and/or ordinary mail.

                                                  S/LaShawn R. Saulsberry
                                                  Case Manager